UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN HARDWICK, )
 )
    Plaintiff, ) Case No. 3:06-1170
 ) Judge Trauger
v. )
 )
CINRAM DISTRIBUTION, LLC, )
CHRISTIAN KWAZU, ROB DECKER, )
AND FAYE OVERALL, )
 )
    Defendants. )

# MEMORANDUM

The defendant has filed a Motion for Summary Judgment (Docket No. 27), to which the plaintiff has responded (Docket No. 32), and the defendant has replied (Docket No. 40). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, John Hardwick, worked for defendant Cinram Distribution, LLC, ("Cinram"), a manufacturer and distributer of DVDs, as a "Team Lead" at the defendant's Lavergne, Tennessee distribution center, from August 26, 2005, until January 17, 2006, when he was terminated.[1] Mr. Hardwick, a Caucasian male born on April 2, 1946, alleges that he was discharged by Cinram due to his race and his age, and in retaliation for his reporting other discriminatory acts, in violation of Title VII and the Tennessee Human Rights Act.

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1), the plaintiff's Response in Opposition to the defendant's Motion for Summary Judgment (Docket No. 32), the plaintiff's Response to the defendant's Statement of Material Facts (Docket No. 33), and the plaintiff's Additional Statement of Material Facts (Docket No. 34).

1

Mr. Hardwick began his employment with Cinram in its Materials and Logistics Department, but was later moved to its DVD Packaging Department, under the supervision of Christian Kwazu. Mr. Kwazu reported to Senior Supervisor Rob Decker, whose supervisor was Plant Manager Wayne Wilcox. In the DVD Packaging Department, Mr. Hardwick was responsible for unloading MGM products, operating motorized equipment, verifying product counts, ensuring that the materials were transported correctly, and moving the items to the production line.

Mr. Hardwick alleges that his supervisor, Mr. Kwazu, mistreated him in various ways. According to the plaintiff, Mr. Kwazu disallowed him from leaving his work area without Mr. Kwazu's permission, from talking to other employees about topics unrelated to his job while on the production line, and from using the copy machine in the scheduler's office, although other employees were not subject to these restrictions. In addition, Mr. Hardwick alleges that Mr. Kwazu "gave him no support" (Docket No. 32 at p. 2), spoke to him in an angry, demeaning manner, required him to wear his official green vest while other employees did not have to wear their official vests, ignored his work-related questions, and instructed the plaintiff to stay at work one evening when he was sick (although the plaintiff did, in fact, leave work that day). Finally, Mr. Hardwick alleges that Mr. Kwazu did not allow the plaintiff to attend certain "Team Lead meetings," although he was, himself, a Team Lead, and that Mr. Kwazu often yelled at him. (*Id.*) Supplementing these specific allegations, Mr. Hardwick also alleges that Mr. Kwazu treated him in a generally disfavored manner and that another supervisor working at Cinram, Frank Kelly, discriminated against and harassed him by calling him a racist.

Objecting to his treatment, in December 2005, Mr. Hardwick approached Mr. Kwazu's

immediate supervisor, Rob Decker, and told him that he felt he was being discriminated against. Mr. Decker asked Mr. Hardwick to write down these allegations. Mr. Hardwick did so and submitted the written statement to Faye Overall, a Human Resource Administrator. On January 6, 2006, Mr. Hardwick had a meeting with Ms. Overall regarding his complaints. The plaintiff alleges that, after he submitted this statement, Mr. Kwazu's treatment towards him "got worse" and that Mr. Decker began treating him less favorably as well.[2] (*Id*.)

On January 11, 2006, Mr. Hardwick went to work feeling sick. At some point during his shift, Mr. Hardwick told Mr. Kwazu that he wanted to go home. Mr. Kwazu asked the plaintiff who would do his work if he went home. In response, the plaintiff contacted Mr. Decker, and told him that Mr. Kwazu would not let him go home. Mr. Decker told the plaintiff that, if he was feeling ill, he needed to go home. Next, after speaking with Mr. Decker, the plaintiff told Mr. Kwazu that he was going home and that he had Mr. Decker's approval to do so. On his way out, the plaintiff attempted to shake Mr. Kwazu's hand, but was rebuffed.

Mr. Hardwick's next shift was not until January 16, 2006. On that day, shortly after Mr. Hardwick arrived, Mr. Kwazu told him to see Ms. Overall. Mr. Hardwick went to her office and, upon his arrival, Ms. Overall asked him "what his problem was." (*Id*. at p. 5) Mr. Hardwick asked her to clarify what she meant. Ms. Overall then asked Mr. Hardwick about an "altercation" between himself and Mr. Kwazu on his prior shift. Mr. Hardwick said that he knew of no such altercation, that he had gone home early on his previous shift due to illness, and that he believed he was being discriminated against. Ms. Overall said that discrimination was a

---

[2]The defendant has presented testimony from Mr. Decker that the plaintiff met with him daily to complain about various coworkers, and from Mr. Kwazu that the plaintiff had problems getting along with a number of his coworkers. (Docket No. 33 at ¶ 10, 11)

legal term and that Mr. Hardwick was not qualified to assess whether it applied in his case. Ms. Overall took Mr. Hardwick's security badge, and Mr. Hardwick was escorted from the building. Mr. Hardwick alleges that he was not specifically told that he was being terminated or given a reason for his termination. The defendant alleges that the reason for Mr. Hardwick's termination was insubordination. Specifically, the defendant alleges that Mr. Hardwick walked away from Mr. Kwazu when Mr. Kwazu was speaking to him and that Mr. Hardwick had caused problems on an "almost nightly" basis on the production line. (Docket No. 33 at ¶ 32)

The plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge against Cinram on May 2, 2006. Within 90 days of receiving a Notice of Right to Sue from the EEOC, on December 6, 2006, the plaintiff filed this action, alleging (1) race discrimination in violation of Title VII of the Civil Rights Act and under the Tennessee Human Rights Act ("THRA"), (2) age discrimination in violation of the Age Discrimination in Employment Act and the THRA, and (3) Unlawful Retaliation in violation of Title VII and the THRA.

On November 18, 2004, Mr. Hardwick and his wife had filed a Voluntary Petition for Chapter 13 Bankruptcy, which required them to list "[o]ther contingent and unliquidated claims of every nature." (*Id*. at ¶ 35) The plaintiff and his wife wrote "none." (*Id*.) In the Statement of Financial Affairs, the plaintiff and his wife listed a then-pending lawsuit, in which Mr. Hardwick had been listed as a defendant, but not the present case because, of course, it had not yet been filed. (*Id*.) On February 1, 2005, the Bankruptcy Court confirmed the Chapter 13 Plan. Under the Plan, the Hardwicks were to pay only 1% of the debt owed to their unsecured creditors.

On February 21, 2006, the plaintiff filed a Motion to Add Creditor and Amend Schedules to add "Judgment Recovery of Nashville," an unsecured creditor that the Hardwicks had not

4

disclosed on their Petition. The motion was granted by the Bankruptcy Court on March 16, 2006. On January 26, 2007, the plaintiff filed for another modification of the Plan, to remove his mortgage debt from the Plan, which he would then pay directly. Finally, on March 7, 2007, the Bankruptcy Court dismissed the plaintiff's Chapter 13 case for non-payment and, on April 27, 2007, the Bankruptcy Court denied the plaintiff's application to set aside the dismissal. The plaintiff did not, at any time, move to modify his Chapter 13 Plan to give notice of the present action.

## ANALYSIS

**I.       Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547,

5

551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

**II.     Judicial Estoppel**

The judicial estoppel doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). The Sixth Circuit has explained that judicial estoppel "preserve[s] the integrity

6

of the courts by preventing a party from abusing the judicial process through cynical gamesmanship," *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (internal quotation omitted), and that the doctrine prevents "playing fast and loose with the courts, . . . blowing hot and cold as the occasion demands . . . [and] hav[ing] [one's] cake and eat[ing] it too." *Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988) (internal citations omitted) (alteration in original). Judicial estoppel "should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.'" *Eubanks v. CBSK Financial Group, Inc.*, 385 F.3d 894, 897 (6th Cir. 2004)

Although noting that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle," the Supreme Court has identified the following considerations for determining whether to apply judicial estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (internal quotations omitted). The Supreme Court warned, however, that these factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id*. at 751.

In light of these considerations identified by the Supreme Court, the Sixth Circuit has

7

held that "[t]he doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)).

The defendant urges the court to apply judicial estoppel in the present case to bar the plaintiff's claims, on the basis that the defendant did not disclose this suit to the Bankruptcy Court in his Chapter 13 proceeding. The Bankruptcy Code requires debtors to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). This "duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action" to the bankruptcy court. *Bohanan v. Bridgestone/Firestone North American Tire*, LLC, No. 3:06cv122, 2007 WL 1091209 at *3 (M.D. Tenn. 2007) (quoting *In Re Costal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999)). The disclosure obligations "are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge." *Id.* (citing *In re Colvin*, 288 B.R. 477, 481 (Bankr. E.D. Mich. 2003); *see also In re Costal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999) ("Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized.") (citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988)).

The Sixth Circuit has found that judicial estoppel should be applied to bar causes of action that were not disclosed to the bankruptcy court. *See Lewis v. Weyerhauser Co.*, 141 Fed.

8

Appx. 420, 425 (6th Cir. 2005) ("This court has previously found that pursuing a cause of action that was not disclosed as an asset in a previous bankruptcy filing creates an inconsistency sufficient to support judicial estoppel.") (citing *Eubanks*, 385 F.3d at 898; *Browning*, 283 F.3d at 775). Indeed, consulting both the three-pronged approach suggested by the Supreme Court and the Sixth Circuit's more concentrated, two-pronged approach, it appears that the doctrine should be applied in the present case. By failing to update his bankruptcy filing to include the present cause of action while simultaneously pursuing that cause of action in this court, the plaintiff adopted inconsistent positions. *See Lewis*, 141 Fed. Appx. at 425 ("Lewis's pursuit of her current discrimination action is without question 'contrary to' her sworn bankruptcy petition."). By enforcing the plaintiff's Chapter 13 Plan under the assumption that no additional assets existed, the Bankruptcy Court adopted the plaintiff's original position. *Id*. ("[I]t is also clear that in confirming Lewis's Chapter 13 plan, the bankruptcy court adopted Lewis's statement that she had no potential causes of action.") That position redounded to the plaintiff's benefit, in that he was required only to pay 1% of his unsecured debt, which was a substantial portion of his total bankruptcy obligations.

Accordingly, under the factors set forth by the Supreme Court and the Sixth Circuit, judicial estoppel should apply. *C.f. Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988) ("[W]hen a bankruptcy court—which must protect the interests of all creditors—approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position, that, in our view, is sufficient 'judicial acceptance' to estop the party from later advancing an inconsistent position."); *De Leon v. Comcar Indust.*, 321 F.3d 1289, 1291 (11th Cir. 2003) (applying judicial estoppel as a result of omissions in a Chapter 13 bankruptcy petition).

9

The Sixth Circuit has held that, even where the above considerations would otherwise dictate that judicial estoppel should apply, its application is "inappropriate when such omissions are the result of mere mistakes or inadvertent conduct." *Eubanks* 385 F.3d at 898 (citing *Browning*, 283 F.3d at 775). Mistakes and inadvertence have been found where the debtor "lacks the knowledge of the factual basis of the undisclosed claim or where the plaintiff has no motive for concealment." *Id.* (citing *Browning*, 283 F.3d at 775); *see also In re Costal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999).

Although the plaintiff did not have knowledge of the factual basis of his claim at the time he filed for bankruptcy, he did have knowledge of those facts throughout much of the course of his bankruptcy, and the failure to update an asset schedule to include a lawsuit—even where the suit had not been initiated at the time the bankruptcy began—can lead to application of judicial estoppel. *See Best*, 339 B.R. at 185 ("[G]iven a petitioner's duty to amend her bankruptcy petition, the court finds that Best did not lack knowledge of the factual basis of the undisclosed claims.") The plaintiff was under a duty not only to disclose assets at the time of his bankruptcy filing, but also to update those disclosures during the pendency of the bankruptcy. The plaintiff took affirmative steps to notify the Bankruptcy Court of another case, in which he was a named defendant, and later modified his Chapter 13 Plan in order to remove his mortgage. Certainly, by the time this second modification occurred, the plaintiff had knowledge of the factual basis of this suit, because he had already filed it. Nevertheless, the plaintiff did not notify the Bankruptcy Court of this lawsuit in that pleading. Accordingly, the plaintiff cannot avoid judicial estoppel on the basis of lack of knowledge.

In almost every Chapter 13 case, the debtor has a motive to conceal assets because "[i]t is

10

always in a Chapter 13 petitioner's interest to minimize income and assets." *Lewis*, 141 Fed. Appx. at 426 (internal quotation omitted); *see also Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1288 (11th Cir. 2002). The rationale behind this rule is simple. The more assets that a Chapter 13 debtor discloses to the court, the greater the percentage of his or her total debt will be included in the payment schedule.

Nevertheless, courts have held that a motive to conceal does not exist in two situations: (1) where the debtor has made significant efforts to notify the trustee or other parties about the lawsuit, but inexplicably did not move to modify his or her asset schedule, and (2) where the debtor is, nevertheless, paying 100% of his or her debt. Neither of these situations apply to the case at hand.

In *Eubanks*, 385 F.3d at 895-97, the Sixth Circuit reversed the district court's application of judicial estoppel to the plaintiffs' claims because, although the plaintiffs omitted their cause of action from the bankruptcy schedule, they notified the trustee about the claim during a meeting, asked the trustee if he intended to pursue the claim on behalf of the estate, moved the bankruptcy court for a status conference regarding the issues underlying the claim, moved (unsuccessfully) to have the trustee substituted for the plaintiffs after the lawsuit had been filed, and filed an amendment to the bankruptcy petition to add the lawsuit to the asset schedule after the defendant had filed a motion to dismiss. In light of these myriad efforts, the Sixth Circuit found that the plaintiffs' omission had been in good faith and, in all likelihood, inadvertent, "particularly since [the] [p]laintiffs' desire to pursue a liability claim against [the] [d]efendant was a fact known by all parties involved." *Id.* at 899.

In contrast, in *Lewis*, 141 Fed. Appx. at 427, the Sixth Circuit found that, despite the fact

11

that the plaintiff had contacted the trustee's office about her cause of action, the plaintiff had not taken "affirmative steps to fully inform the trustee and the bankruptcy court of the action," and, therefore that the omission was intentional and consistent with a motive to conceal. The Court noted that "Lewis never sought to amend her bankruptcy schedules, nor did she file a motion or make any other sort of attempt to inform the bankruptcy court of her discrimination action" and there was no evidence that Lewis' alleged conversation with a woman who worked for the trustee occurred before the judicial estoppel issue was raised. *Id*. Additionally, the court found "unpersuasive Lewis's assertion that she relied in good faith on the advice of her attorney's paralegal" that she did not need to disclose the claim, citing the "general proposition that a litigant is bound by the errors of his or her attorney." *Id*. (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the act or omissions of this freely selected agent.").

Likewise, the court finds the plaintiff's arguments in favor of good faith inadvertence to be unpersuasive. The plaintiff has identified no affirmative steps taken to notify the trustee or the Bankruptcy Court about the cause of action pending before this court. The plaintiff argues that he had no knowledge of his obligation to notify because he was never told of such obligation by his bankruptcy attorneys, and further notes that his bankruptcy attorney is not the same attorney that represents him in the pending litigation. Under *Lewis*, these arguments are simply unavailing. The plaintiff cannot avoid the consequences of the acts or omissions of his attorneys by arguing that he did not know about his obligations.

The second way in which a debtor may show that he or she lacked a motive to conceal is by showing that he was, regardless of the unnamed asset, scheduled to pay 100% of his or her

12

debt. *See Best v. Kroger Co.*, 339 B.R. at 185 ("That Best and her husband consented to increasing the percentage owed to their unsecured creditors . . . does, however, strengthen Bests's position that she had no motive to conceal and that her failure to disclose was inadvertent.") The rationale behind this rule is clear: where the profit motive for concealment is eliminated, there is no longer sufficient basis for a presumption in favor of such a motive. *See also Browning*, 283 F.3d at 776 ("[The plaintiff] will thus receive no windfall as a result of its failure to disclose its claims, because only [its] creditors will receive the distribution of any recovery.").

The plaintiff was not scheduled to pay 100% of his debt. To the contrary, the plaintiff was scheduled to pay only 1% of his total unsecured debt. The plaintiff's total debt to his secured creditors was $70,500.00. (Docket No. 27, Ex. 8 at p. 8) His total debt to unsecured priority debtors was $74,506.18. (*Id.*) The plaintiff's total unsecured nonpriority debt was $165,663.01. (*Id.*) Accordingly, the plaintiff's total unsecured debt was $240,169.19, or 77% of his total debt, and the plaintiff was only scheduled to pay roughly 23.5% of that total debt. Unlike the plaintiffs in *Browning* and *Best*, the plaintiff most certainly would have received a windfall by recovering in this case while discharging his debts through his bankruptcy plan.

The plaintiff argues that judicial estoppel should not apply because the motivation behind his last modification of his Chapter 13 Plan—in which he removed his mortgage payments from bankruptcy—was not his own benefit. This argument is unpersuasive for several reasons. First, although the court understands that, while removing his mortgage from the Chapter 13 Plan the plaintiff was, nevertheless, required to pay the mortgage directly to his mortgage bank, it does not follow that this modification was necessarily undertaken against the plaintiff's own self-

13

interest. The plaintiff may have desired to pay off his mortgage more quickly or had some other reason to separate his mortgage payment from his bankruptcy. It is hard to understand why, otherwise, he undertook the effort of making the modification. The plaintiff himself has offered no alternative rationale.

More importantly, it is not the motivation behind that particular modification that controls. Rather, the question is whether the plaintiff had a motive to conceal the present action, which he did conceal. Unless the plaintiff had moved to modify his Plan to pay 100% of his total debt, there would remain a motive to conceal assets. Regardless of the plaintiff's situation with his mortgage bank, the fact remains that he was scheduled to pay much less than 100% of his total debt. Although the motion to modify did not decrease the total amount of debt he would be paying—though a portion of that debt was now allocated to be paid directly to his mortgage bank rather than through the Plan—neither did it increase that percentage to near 100%. Accordingly, the motivation to conceal was present.

## CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge